**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION**

KEVIN K. SCOTT,                          :          Case No. 1:12 CV 00478

      Plaintiff,                      :

v.                                       :

COMMISSIONER OF SOCIAL SECURITY,         :          MAGISTRATE'S REPORT AND
                                                    RECOMMENDATION

      Defendant.                      :

## I. INTRODUCTION.

Filed pursuant to 42 U. S. C. §§ 405(g) and 1383, Plaintiff seeks judicial review of Defendant's final determination denying his three claims for disability insurance benefits:  (1) Child's Insurance Benefits (CIB) under 42 U. S. C. § 402(d)(1); (2) Disability Insurance Benefits (DIB) under Title II of the Social Security Act (Act), 42 U. S. C. §§ 416 (i) and 423; and (3) Supplemental Security Income (SSI) under Title XVI of the Act, 42 U. S. C. §§ 1381 *et seq*.  The issues before the Court are presented in cross-Briefs on the Merits (Docket Nos. 12 & 17).  For the reasons that follow, the undersigned Magistrate Judge recommends that the Court affirm the Commissioner's decision.

## II. PROCEDURAL BACKGROUND.

Plaintiff filed applications for CIB, DIB, and SSI on September 6, 2007, alleging that he

became unable to work because of his disabling condition on September 17, 2006 (Docket No. 10, pp. 124-126; 127-128; 132-142 of 488).   The applications were denied initially and upon reconsideration (Docket No .10, pp. 65-67; 68-70; 75-77; 79-80; 82-84; 86-88 of 488).  Plaintiff requested an administrative hearing which was conducted in Cleveland, Ohio, before Administrative Law Judge (ALJ) Mark M. Carissimi (Docket No. 10, pp.27,  89-90, 96-100 of 488).

1.      THE ADMINISTRATIVE HEARING.

At the administrative hearing conducted on February 26, 2009, Plaintiff appeared with counsel.  His mother, Dorthelia Smith-Milligan, also referred to as Dorthelia Scott-Milligan and Bordia Smith Milligan, and a Vocational Expert (VE), Ted Macy, also appeared and testified (Docket No. 10, pp. 13, 25, 161 of 488).

A.      PLAINTIFF'S TESTIMONY.

Plaintiff was 23 years of age at the time of hearing.  Placed in special education classes during his first grade school year, Plaintiff graduated from high school with a special education diploma.  Now, Plaintiff considered himself functionally illiterate because he did not read well or comprehend what he read.  Upon obtaining classroom instruction on driving techniques and street signs and symbols, Plaintiff took the written examination using an audio tape to acquire his driver's license (Docket No. 10, pp. 32-33 of 488).

There are five impairments that Plaintiff claimed preclude him for working:  (1) asthma, (2) chest pains, (3) headaches, (4) a hyperactive thyroid and (5) a learning disability.  With respect to his asthma, atmospheric conditions affected the onset of his symptoms.  Plaintiff was prescribed medication and used a bronchodilator twice daily (Docket No. 10, pp. 29, 20 of 488).

Plaintiff experienced chest pain daily for approximately fifteen minutes at a time. Describing his pain on a scale of one to ten where ten denotes more severity, Plaintiff claimed that his pain was

2

commonly a seven or eight.  In fact, the pain was so sharp that it provoked tears.  For the pain, Plaintiff took aspirin and laid down to rest.  It generally took one half hour for the pain to subside (Docket No 10, pp. 30-31 of 488).

Plaintiff had headaches daily that lasted one hour.  He took Tylenol® for the pain (Docket No. 10, pp. 31, 32 of 488).

The symptoms from Plaintiff's thyroid deficiency included fatigue and weakness.  In fact, Plaintiff claimed that he slept "a lot" because of his thyroid deficiency.  It was his opinion that the Synthroid®, a physiologic stimulus for the synthesis and secretion of thyroid hormones, was ineffective (Docket No. 10, pp. 31, 35 of 488; PHYSICIAN'S DESK REFERENCE, 2006 WL 354229 (Thomson PDR 2006)).

Plaintiff lived with his mother and stepfather in a house.  His mother did not work outside of the home and she did most of the household chores, including cleaning Plaintiff's room and making his bed.  Plaintiff claimed that he could not do much because moving around and standing precipitated dizziness and dyspnea.  So during a typical day Plaintiff got up and watched television most of the day although he could not concentrate long enough to watch an entire program.  He did assist with the care of his nephews, aged six and eight years.  Playing with his nephews was limited to activities that did not incite his asthma symptoms.  Because of his condition, Plaintiff was afraid to drive so he rode with his mother (Docket No. 10, pp. 34, 35, 36 of 488).

During his high school years, Plaintiff participated in LEAP, a program apparently designed to assist with the preparation for and placement of developmentally disabled students in the workforce.  Plaintiff was placed at T & T Fashion.  Even as a part-time employee, Plaintiff could not perform the job of sales clerk because it required extensive standing.  When standing for extensive

periods of time, Plaintiff became dizzy (Docket No. 10, pp. 43, 44, 45, 47-48 of 488).

In August 2006, a physician placed Plaintiff on light duty and recommended that Plaintiff wear a mask and avoid manual labor (Docket No. 10, p. 50 of 488).  Nevertheless, Plaintiff worked in an auto detailing business known as "Ganley" through the third quarter of 2007.  Once he was instructed as to how to perform the job, Plaintiff used significant movement when cleaning the interior of automobiles.  The heaviest thing lifted during this job was a vacuum cleaner which Plaintiff claimed weighed between twelve and fifteen pounds.  Although Plaintiff was not as productive as his counterparts, Plaintiff claimed that he was discharged pursuant to a reduction in force not poor work performance (Docket No. 10, pp. 38, 39, 46 of 488).

Plaintiff attempted to maintain employment through a temporary staffing resource.  Plaintiff was discharged from his agreement with the staffing agency because of his inability to stand for a long time (Docket No. 10, p. 40 of 488).

B.    MS. MILLIGAN'S TESTIMONY.

Ms. Milligan identified the inciting incident in Plaintiff's physical decline as the onset of a hyperactive thyroid attack.  Afterwards Plaintiff was lethargic and depressed as evidenced by his sleeping all day and rarely leaving the residence.  Ms. Milligan confirmed that Plaintiff "really doesn't do much of anything all day."  However, if she was not feeling well and Plaintiff told her he wanted breakfast, he would make himself toast or prepare a bowl of cereal.

Ms. Milligan recalled that Plaintiff had been instructed to refrain from lifting more than ten pounds and now, Plaintiff exerted only minimal effort because of the chronic headaches.  Plaintiff did not "hang out" with his friends or play basketball.  It was her opinion that Plaintiff's condition had worsened (Docket No. 10, pp. 48, 49, 50, 51 of 488).

C.    THE VE'S TESTIMONY.

4

The VE explained that Ganley personnel accommodated Plaintiff's impairments.  Without the various accommodations, Plaintiff would not have been a competitive detailer anywhere else (Docket No. 10, p. 54 of 488).

In the *first hypothetical question*, the ALJ asked the VE to consider the following claimant:

(1)     Twenty years of age with a high school special education degree and no past relevant work:

(2)     Limited to medium exertional level, specifically, he or she could lift and carry up to fifty pounds occasionally, lift and carry twenty-five pounds frequently; stand and walk for six hours out of the eight-hour workday; sit for six hours out of the eight-hour workday; push or pull up to fifty pounds occasionally; push and pull twenty-five pounds frequently and avoid concentrated exposure to cold, concentrated exposure to extreme heat and concentrated exposure to smoke or fumes.

(3)     Could perform simple repetitive work and not work at high production quotas or perform piece work;

(4)     Instructions given by demonstration or orally explained and he or she could have superficial interaction with co-workers and the public without negotiation or confrontation.

(Docket No. 10, p. 55 of 488).

Based on his own experience combined with data available from the Department of Labor and the Bureau of the Census, the VE explained that an example of work that this claimant could perform included a job as laundry laborer, a medium, unskilled job.  Described in the DICTIONARY OF OCCUPATIONAL TITLES (DOT) at 361.687-018, the laundry laborer prepares laundry for processing which may include, among other things, opening bundles of soiled laundry, placing bundles onto a conveyor belt or dropping the bundles down a chute for distribution to marking and classification sections, weighing laundry on scales and recording weight on tickets and unloading soiled linen from trucks.  Reduced by the environmental limitations that the ALJ found appropriate, there were 650 jobs in Northeast Ohio and 95,000 jobs nationally.

Another example of a job that the hypothetical claimant could perform would be a hand packager.  This job is considered medium, unskilled work.  Described in DOT at 920.587.018, a hand

5

packager packages material and products manually and may also weigh containers and adjust the quantity; nail, glue, or close and seal containers; label containers, container tags, or products; sort bundles or fill containers; and pack special arrangements or selections of products.  Reduced by the environmental limitations  the ALJ found appropriate, there were approximately 600 jobs in Northeast Ohio and 75,000 jobs nationally (Docket No. 10, pp. 56-57 of 488).

Another example of employment given the limitations of the hypothetical claimant includes a bench assembler which is considered light, unskilled labor.  Described in DOT at 706.684-022, the bench assembler performs any combination of repetitive tasks such as assembling small parts that might require nuts and bolts.  The nuts and bolts may then be packaged and then stockpiled for later use in a production spot.  In Northeast Ohio there are 900 jobs and there are 175,000 jobs nationally (Docket No. 10, pp. 57, 58 of 488).

In the *second hypothetical question,* the ALJ asked the VE to consider the same characteristics from the first hypothetical question, in addition to difficulties with maintaining pace and persistence and fatigue and they would be off task 20% of the time.  The VE explained that with this rate of off task behaviors, special accommodation would be required.  Otherwise there would be no jobs that this hypothetical claimant could perform at a competitive level (Docket No. 10, pp. 57-58 of 488).

In the *third hypothetical question*, the ALJ asked the VE to consider the same characteristics from the first hypothetical question, reduce the exertional level to light work and then add the restriction that the hypothetical claimant must avoid concentrated exposure to cold, heat, smoke, fumes, odors, dust, gases and poor ventilation.  The VE responded that the jobs of laundry laborer and hand packager would be eliminated and the bench assembler job would remain because the VE took the proposed limitations in consideration with the first hypothetical question (Docket No. 10,

pp. 58-59 of 488).

**D.     THE ALJ'S DECISIONS.**

Based on the testimony of Plaintiff, Ms. Milligan, the VE and the medical evidence in the

record, the ALJ concluded that:

(1)     Plaintiff met the insured status requirements of the Act through June 30, 2008.

(2)     Plaintiff had not engaged in substantial gainful activity since September 17, 2006, the alleged onset date of impairment.

(3)     Plaintiff had severe impairments such as borderline intellectual functioning, reading disorder, learning disorder, asthma and hyperthyroidism.  However, Plaintiff did not have an impairment or combination of impairments that met or equaled of the listed impairments.

(4)     Plaintiff had the residual functional capacity to perform medium work, limited to:
- Simple, repetitive work without high production quotas;
- Instructions must be given orally or by demonstration;
- Limited to superficial interaction with the public and with co-workers without negotiation or confrontation.
- Plaintiff must not be exposed to extreme temperatures or concentrated amounts of smoke or fumes.

(5)     Plaintiff had no past relevant work but there were jobs that existed in significant numbers in the national economy that a person of Plaintiff's age, education, work experience and residual functional capacity could perform.

(6)     Based on the application for disabled CIB filed on September 6, 2007, Plaintiff was not disabled under Section 223(d) of the Act.

(7)     Based on the application for a period of disability and DIB filed on September 6, 2007, Plaintiff was not disabled under Section 216(i) and 223(d) of the Act.

(8)     Based on the application for SSI filed on September 6, 2007, Plaintiff was not disabled under Section 1614(a)(3)(A) of the Act.

(Docket No. 10, pp. 10--24 of 488).

**E.     APPEALS COUNCIL ACTION.**

The Appeals Council considered whether:

(1)     The ALJ abused his discretion.

(2)     There was an error of law.

(3)     The decision was supported by substantial evidence.

(4)     There was a broad policy or procedural issue that affected the public interest.

(5)     There was new and material evidence and the decision was contrary to weight of all evidence in the record.

Finding that there was no basis for changing the ALJ's decision, Plaintiff's request for review was denied and the ALJ's decision became the final decision of the Commissioner on December 14, 2009 (Docket No. 10, pp. 5-7 of 488).

**F.    JUDICIAL REVIEW**

Plaintiff sought judicial review of the Commissioner's decision in the United States District Court for the Northern District of Ohio.  The undersigned Magistrate Judge recommended that pursuant to sentence four of 42 U. S. C. § 405(g), the Court remand this case to the Commissioner to assess Plaintiff's residual functional capacity, whether he had the ability to do sustained work related physical and mental activities in a work setting on a regular and continuing basis, and whether this new assessment affected the finding of disability.  United States District Judge James S. Gwin adopted the Report and Recommendation on February 22, 2011.  The Appeals Council remanded the case to the ALJ on April 18, 2011 for further administrative hearing (Docket No. 10, pp. 401-412, 413-429, 430-432 of 488).

**2.    THE ADMINISTRATIVE HEARING.**

Pursuant to the order of remand, ALJ Thomas M. Randazzo conducted an administrative hearing on November 16, 2011.  Plaintiff, represented by counsel, a VE, Ted S. Macy and a Medical Expert (ME), Dr. Hershel Goren, a certified neurologist, appeared and testified (Docket No. 10, pp. 325-326 of 488).

**A.    PLAINTIFF'S TESTIMONY.**

Now, Plaintiff was 25 years of age.  He was 5'11" and he weighed 250 pounds.  He and his parents had moved to a new residence.  A cousin lived with them.  Ms. Milligan, an asthmatic and diabetic, had some health complications but Plaintiff was uncertain if she was disabled as defined in

8

the Act (Docket No. 10, pp. 332, 333, 335, 362 of 488).

Since the last hearing, Plaintiff had not explored possible employment opportunities, taken classes, attempted to further his education or undergone vocational training because he had the added responsibility of caring for his mother.  In addition, his medication had been changed and the side effects of his medication included profuse fatigue.  Moreover, he continued to have chest pains that lasted three to five minutes, three times weekly.  Two months prior to the hearing, the pains were so severe that he was transported to the hospital by ambulance.  Plaintiff estimated that once every six months, he had a severe attack (Docket No. 10, pp. 346-349, 352 of 488).

Apparently since the last hearing, Plaintiff was diagnosed with hypertension and hyperlipidemia.  Medications to control these disorders, including a diuretic, were prescribed.  Except for the couple a times weekly that he forgot, Plaintiff was compliant with his medication regimen (Docket No. 10, pp. 361-362 of 488).

Plaintiff testified that he had a son who was four years of age.  His son visited twice monthly and during those visits, Plaintiff dressed and fed his son.  Plaintiff's mother assisted Plaintiff with his son's care (Docket No. 334, 335 of 488).

Since the last hearing, Plaintiff had learned to make simple meals like sandwiches and to heat frozen dinners.  He even washed dishes, made his bed, drove and shopped for junk food.  When either of his parents was  unable to drive him to his destination, Plaintiff speculated that he could take the bus (Docket No. 10, pp. 334, 335 of 488).

The ability to read had not changed.  Plaintiff could read signs and identify short words such as "stop" and "go" (Docket No. 10, p. 337 of 488).  Plaintiff confirmed that he never wrote a check and he was unable to "handle" a checkbook (Docket No. 10, p. 358 of 488).

Plaintiff expounded upon his prior testimony about his employment at Ganley.  He worked at

Ganley Ford on Lorraine and Ganley Lakewood during 2008, 2007 and 2006, approximately thirty hours weekly.  During the course of his work at Ganley Ford, Plaintiff started to have chest pains.  He took medical leave for a couple of months.  Upon his release to return to work, he went to work at Ganley Lakewood.  Plaintiff had no difficulty following instructions because they were delivered orally.  He got sick again and then he quit.  Apparently he went to work at Ganley in 2008 and quit once he started getting lightheaded (Docket No. 10, pp. 338-344, 349, 351 of 488).

While at Ganley, Plaintiff was exposed to chemical compounds in the cleaning solutions.  He admitted that he was absent on several occasions during which time he had to regulate his breathing with a bronchodilator or inhaler (Docket No. 10, p. 353 of 488).

Plaintiff had developed a friendship and occasionally, his friend would visit and they would play games on the Nintendo Wii.  Plaintiff admitted that he sat while playing the games and that he was able to complete the game.  Plaintiff had difficulty using a computer because of his inability to "recognize some words" (Docket No. 10, pp. 345-346 of 488).

### B.  THE ME'S TESTIMONY.

Having been certified in neurology after training, testing and practicing in the area, the ME explained that in his professional opinion, Plaintiff had severe impairments, namely asthma, borderline intellectual functioning and a reading disorder.  He did not find that hyperthyroidism, hypothyroidism, hypertension or hyperlipidemia were severe impairments.  Symptoms of hyperthyroidism and hypothyroidism responded "very nicely" to treatment.  In fact the usual reason an individual would not respond to treatment is that he or she was not medication compliant.  Based on the medical evidence, hypertension and hyperlipidemia were not severe impairments.  Furthermore, there was no basis in the record for a learning disorder (Docket No. 10, pp. 365, 366, 367 of 488).

It was the ME's opinion that Plaintiff's impairments did not meet or equal any listing either

10

individually or collectively.  He acknowledged that the only physical restriction was to avoid concentrated fumes, odors, dust and gas.  Plaintiff's had three mental/functional restrictions:  (1) performing simple, one and two step instructions for repetitive tasks, (2) no reading except for rudimentary words and illustrations and highly stereotyped information such as signs and (3) no high production quotas.  Plaintiff had no disease that would restrict him from having a production expectancy (Docket No. 10, pp. 367-369, 371 of 488).

The ME found no basis in the record for restrictions based on the history of chest pain and no basis for functional limitations that included ramps, stairs, ladders, ropes, scaffolds or superficial interaction with co-workers and the public.  According to the ME, Plaintiff had mild difficulties in daily living and maintaining social functioning but moderate difficulties in concentration, persistence and pace (Docket No. 10, pp. 370-371 of 488).

C.      THE VE.

The VE prefaced testimony by explaining that as a vocational consultant, he was familiar with jobs that exist in the northeast quadrant of the State of Ohio and the national economy as well as the Social Security Administration's definitions.  The VE's testimony was based on his knowledge, education, training and experience consistent with the DICTIONARY OF OCCUPATIONAL TITLES (DOT), a standardized occupational record that systematically compares and matches the specifications for selected jobs (Docket No. 10, pp. 375, 376 of 488; www.occupational info.org).

First, the VE classified the detailer position as a medium, unskilled job, performed at a light exertional level.  It was an accommodated job which Plaintiff did not perform at a competitive level. Plaintiff was allowed to work at a slower pace than others.  The auto detailer, defined at DOT 915.687-034, was medium work as normally done and the level of specific vocational preparation (SVP) was anything beyond short demonstration up to and including one month (Docket No. 10, p.

11

377 of 488).    In the *first hypothetical question*, the ALJ posed the following:  the claimant could do medium work but was limited to simple, repetitive work without high production quotas; all instructions must be given orally or by demonstration; interaction with the public was superficial; interaction with co-workers must be without negotiation or confrontation and there must be no exposure to extreme temperatures or concentrated amounts of smoke or fumes.  The VE responded that this hypothetical person could perform work as a laundry laborer, hand packager and bench assembler, all described as follows:

| JOB AND DOT IDENTIFICATION | EXERTIONAL AND SKILL LEVELS | NUMBER OF JOBS IN OHIO/NORTHEAST OHIO/NATIONALLY |
| --- | --- | --- |
| Laundry Laborer DOT Number 361.687-018 | Medium and unskilled work | 5,500/1,200/180,000 |
| Hand Packager DOT Number 920.587-018 | ? | ?/900/170,000 |
| Bench Assembler DOT Number 706.684-022 | | 800/?/110,000 |

In the *second hypothetical question*, the ALJ posed the following restrictions:  must avoid concentrated exposure to fumes, odors, dust, gases and poorly ventilated areas; cannot perform tasks requiring more than rudimentary reading such as "stop," "go," "on,"  "off" and "do not enter"; instructions must be given orally or by demonstration; limited to simple one to two step tasks and routine and repetitive tasks; and further limited to no high production quotas.  The VE responded that the jobs and the numbers would be the same (Docket No. 10, pp. 378-382 of 488).

In the *third hypothetical question*, the ALJ used the same restrictions but limited it to medium level work.  The VE claimed that the jobs and numbers of jobs would remain the same.

The attorney added that this hypothetical question that the employee would need unscheduled breaks of at least one half hour in addition to normal breaks several times per week due to chest pain.

12

The VE's conclusion was inconclusive.  First, he explained that if the work environment was large enough that other employees could and would fill in for the hypothetical claimant during his or her absence, then such absences may not be a "big deal."  Second, other places may find this behavior unacceptable and the hypothetical claimant may be subject to discharge.

Finally, the attorney interjected that the hypothetical claimant may experience chest pain and need to leave for the day, up to two times weekly and two times monthly.  The VE explained that this course of action was unacceptable (Docket No 10, pp. 382, 384 of 488).

In the *fourth hypothetical question,* the ALJ added:  limited to no requirement of any production expectancy.  Here, the VE explained that in the jobs listed above required that the worker keep busy and stay on task throughout the day; otherwise, the employee was subject to replacement (Docket No. 10, p. 382 of 488).

**D.    THE ALJ'S DECISION.**

Based on the testimony of Plaintiff, the ME, the VE and the medical evidence in the record, the ALJ concluded that:

(1)    Plaintiff had not attained age 22 as of September 17, 2006, the alleged onset date.  Plaintiff met the insured status requirements of the Act through June 30, 2008.

(2)    Plaintiff had not engaged in substantial gainful activity since September 17, 2006, the alleged onset date of impairment.

(3)    Plaintiff had severe impairments such as borderline intellectual functioning, reading disorder/learning disorder, asthma and hypothyroidism, obesity and edema of the lower extremities.  However, Plaintiff did not have an impairment or combination of impairments that met or equaled of the listed impairments.

(4)    Plaintiff had the residual functional capacity to perform medium work, limited to:

•    Lifting and carrying up to fifty pounds occasionally and twenty-five pounds occasionally.

•    Standing and/or walking for six hours in an eight-hour workday and sitting for two hours in an eight-hour workday

•    Simple one-to-two steps, routine, repetitive work and precluded form task involving high production quotas.

•    Instructions must be given orally or by demonstration;

•    Superficial interaction with the public and with co-workers without negotiation

13

or confrontation.

- No exposure to concentrated amounts of fumes, odors, dust, gases and poorly ventilated areas.
- No exposure to task requiring more than rudimentary reading.

(5) Plaintiff had no past relevant work but there were jobs that exist in significant numbers in the national economy that a person of Plaintiff's age, education, work experience and residual functional capacity can perform, namely, work as a laundry laborer, hand packager and bench assembler.

(6) Based on the application for a period of disability and DIB filed on September 6, 2007, Plaintiff was not disabled under Section 216(i) and 223(d) of the Act.

(7) Based on the application for CIB filed on July 16, 2008, Plaintiff was not disabled as defined in Section 223(d) of the Act prior to January 19, 2008, the date he attained age 22.

(8) Based on the application for SSI filed on September 6, 2007, Plaintiff was not disabled under Section 1614(a)(3)(A) of the Act.

(Docket No. 10, pp. 295- 298- of 488).

V. PSYCHOLOGICAL EVALUATIONS & TREATMENT.

**1. DR. J. JOSEPH KONIECZNY, PH. D., A PSYCHOLOGIST.**

Dr. Konieczny conducted a one-time psychological evaluation on March 31, 2000. Upon conducting clinical interviews of both the fourteen-year-old Plaintiff and his mother, Dr. Konieczny discovered that Plaintiff had been a premature infant with a low birth weight. He developed respiratory difficulties at birth as a result of the premature birth complications. During childhood, Plaintiff experienced no developmental delays but he interacted minimally with his peers and typically remained on the fringe of his peer group. He appeared to have a typical relationship with his siblings and he was considered by his mother to be compliant in home and school settings, only occasionally exhibiting profane behavior.

Dr. Konieczny focused primarily on behavioral observations and focused less on conducting clinical examination or psychological testing that would expose limitations in the concentration, persistence or pace domains. He did, however, administer four tests:

(A)     The Wechsler Intelligence Scale for Children (WISC)

14

(B)     The Wide Range Achievement Test-3 (WRAT-3)
(C)     The Vineland Adaptive Behavioral Scales (VABS)
(D)     The Bender-Gestalt test (BG).

(A) **THE WISC.**

WISC provides an intelligence quotient (IQ) score and essential information critical to a child's cognitive functioning.  Results from the WISC showed that Plaintiff's full scale IQ was within the borderline intellectual functioning for individuals of his age.  Plaintiff showed his most marked deficits in the areas of form perception, verbal concept formation, logical abstract reasoning, social judgment and conformity and organization and application of knowledge.  Plaintiff showed his most marked strengths in the area of pattern recognition, ability to comprehend whole situations, anticipation and planning, to name a few.  The test results showed that Plaintiff's intellectual capabilities were in the borderline range.

(B) **WRAT-3**.

This test measures an individual's abilities in reading, writing and math.  Notably, Plaintiff's achievement capabilities in the area of arithmetic were in the borderline range and were reflective of his overall level of intellectual functioning.  In the spelling achievement subtest, Plaintiff was deficient although somewhat lower than would be anticipated.  Comparing his spelling ability and his performance intellectual capabilities, there was a significant decline.  In the overall analysis, there was a suggestion present that Plaintiff had a reading disorder (Docket No. 10, pp. 186-188 of 488; www.dwp.gov.uk/docs/no1-win-02-test-review-3.pdf; www.pearsonassessments.com).

(C) **VABS**

VABS is an instrument that supports the diagnoses of intellectual and developmental disabilities.  The results from these tests showed Plaintiff's level of adaptive capabilities in the following domains:

15

| (1) | Socialization | Borderline to deficient range. |
| (2) | Communication | Deficient range. |
| (3) | Daily living skills | Deficient range |
| (4) | Receptive communication | Adequate. |

Dr. Konieczny commented that overall, Plaintiff's level of adaptive functioning lies well within the deficient range and is significantly lower than would be anticipated (Docket No. 10, pp. 188-189 of 488; psychcorp.pearsonassessments.com/HAIWEB/Cultures/en-us/Product).

(D)     **BG TEST**

This test is a psychological assessment used to evaluate visual-motor functioning, visual-perceptual skills, neurological impairment and emotional disturbances in children.  Here the results did not indicate any perceptual motor impairment or show any distortion of the overall configuration. There was no evidence of organicity or organic impairment (Docket No. 10, p. 189 of 488; www. medical-dictionary.thefreedictionary.com/Bender-Gestalt+Test).

In conclusion, Dr. Konieczny diagnosed Plaintiff with a reading disorder, disorder of written expression, borderline intellectual functioning, psycho-social stressors such as moderate intellectual limitations, learning disorders, some medical difficulties and apparent slight hearing impairment.  It was his opinion that Plaintiff had moderate symptoms (ex: flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (ex: few friends, conflicts with peers/co-workers) (Docket No. 10, p. 190 of 488; www.gafscore.com).

2.     **DR. DAVID V. HOUSE, PH. D., A PSYCHOLOGIST**.

On April 6, 2004, Dr. House conducted a clinical interview and conducted a background information review from data provided by the Bureau of Disability Determination.  In addition, Dr. House administered three tests:

(A)     Wechsler Adult Intelligence Scale-III (WAIS-III),
(B)     Weschler Memory Scale–III (WMS-III) and

16

(C)     WRAT–reading subtest.

**(A)     <u>WAIS</u>.**

This test measures adult and adolescent intelligence.  Plaintiff's full scale IQ placed him in the borderline range of adult intellectual functioning.  Plaintiff had difficulty with verbal task and common sense.  His relative strength was in logical association of verbal concepts.

**(B)     <u>WMS-III</u>**.

This reading subtest provides clinicians an estimate of general auditory and visual memory functions.  Plaintiff's overall cognitive skills fall in the borderline range (Docket No. 10, pp. 197-198 of 488).

**(C)     <u>WRAT-III</u>**

On this test, the results placed Plaintiff in grade two.  Dr. House considered him illiterate (Docket No. 10, p. 198 of 488).

Dr. House diagnosed Plaintiff with a reading disorder, a learning disorder, borderline intellectual functioning and stressors involving his disorder and verbal learning skill difficulties with placement in special education.  It was his opinion, too, that Plaintiff had moderate symptoms (ex: flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (ex: few friends, conflicts with peers/co-workers).

Dr. House concluded that Plaintiff's ability to concentrate and maintain attention was mildly limited, his pace was a "bit slow" and he was persistent in trying to complete the examiner's tasks.  Plaintiff had difficulty with serial seven-subtraction tasks after the first sequence of digits, he was able to recall two out of three objects after a period of five minutes and his memory of digits was deficient to borderline (Docket No. 10, pp 192-199 of 488; www.gafscore.com).

**3.     D<small>R</small>. C<small>ATHERINE</small> F<small>LYNN</small>, P<small>SY</small>. D.**

17

On October 22, 2007, Dr. Flynn completed both a MENTAL RESIDUAL FUNCTIONAL CAPACITY ASSESSMENT and a PSYCHIATRIC REVIEW TECHNIQUE form.  From the evidence in the file, Dr. Flynn concluded that Plaintiff was moderately limited in the ability to:

(1)     Understand and remember detailed instructions.
(2)     Carry out detailed instructions.
(3)     Respond appropriately to changes in the work setting.

Dr. Flynn found no marked limitations.  It was her opinion that the evidence as a whole indicated that Plaintiff had the capacity to do simple, routine work with infrequent changes.  Plaintiff's statements were considered credible (Docket No. 10, pp. 259-261 of 488).

Dr. Flynn noted that Plaintiff had medically determinable impairments that did not precisely satisfy the diagnostic criteria for mental retardation as defined in 12.05 of the LISTING.  Specifically, Plaintiff was diagnosed with borderline intellectual functioning, an impairment that was distinct from mental retardation.  Plaintiff had a reading disorder and a learning disorder.  With respect to his functional domains, the degree of limitations follows:

(1)     Restriction of activities of daily living     Mild.
(2)     Difficulties in maintaining social functioning     None.
(3)     Difficulties in maintaining concentration, persistence
        & pace     Moderate.
(4)     Episodes of decompensation, each of extended duration
        persistence and pace     None

(Docket No. 10, pp. 263-273 of 488).

### III.  MEDICAL EVALUATIONS AND TREATMENT

### 1.    LAKEWOOD HOSPITAL, LAKEWOOD, OHIO.

On July 19, 2006, Plaintiff presented with chest pain and headaches.  After Plaintiff's admission to the hospital, review of his radiological images showed nothing to suggest ischemia; some of the soft tissue around the diaphragm was obscured and there was apical thinning.  The

18

echocardiography (ECG) and Doppler studies showed normal bi-ventricular function and no significant valvular abnormality.  Plaintiff was given the traditional medications to stabilize episodes of chest pain and headaches, namely, Nitroglycerin and Morphine Sulfate.  Plaintiff was discharged on July 20, 2006, with recommendations that he continue taking aspirin and Tylenol® (Docket No. 10, pp. 201-202, 209-211, 216-237 of 488).  **2.**  **UNIVERSITY HOSPITALS OF CLEVELAND**.

Plaintiff underwent a pulmonary function test on August 11, 2006.  The results showed normal flow rates and normal diffusing capacity of lung and normal lung volumes (Docket No. 10, pp. 253-254 of 488).

For twenty-four hours, Plaintiff wore a Holter monitor which recorded electrocardiographic signals on magnetic tape for scanning and selection of significant but fleeting changes to his heart and respiratory rate.  The results were collated on September 28, 2006 without the benefit of an accurate diary of time of day, activities or symptoms.  Based solely on the test results, Plaintiff had a normal sinus rhythm and two premature ventricular contractions (Docket No. 10, p. 255 of 488; www.medicinenet.com/premature_ventricular_contractions/article.htm; STEDMAN'S MEDICAL DICTIONARY 258430 (27th ed. 2000).

Plaintiff presented to the emergency room on April 21, 2007, complaining of chest tightening and asthma complications that had persisted for two days.  He was given a Tetanus shot because of bruising from a human bite.  Results from the comparison of the ECG administered on April 21, 2007 and an ECG that had been administered on January 11, 2005, showed an abnormal heart rhythm.  The chest X-ray was essentially unremarkable.  Essentially, Plaintiff had mild asthma exacerbation and no acute cardiopulmonary disease (Docket No. 10, pp. 239-245, 256-258 of 488).

**3.**  **DR. MARIA CONGBALAY, M. D., A MEDICAL CONSULTANT**.

Using her reasoned judgment to review all of the evidence in the file, Dr. Congbalay,

19

completed the PHYSICAL RESIDUAL FUNCTIONAL CAPACITY ASSESSMENT on November 1, 2007. She concluded that Plaintiff had no exertional, postural, manipulative, visual or communicative limitations. Because of his weakness and shortness of breath, Plaintiff should avoid concentrated exposure to extreme cold, heat, fumes, odors, dust, gases and poor ventilation (Docket No. 10, pp. 278-284 of 488).

        **4.**        **ST. DAVIDS-GEORGETOWN HOSPITAL, GEORGETOWN, TEXAS.**

Plaintiff presented on February 2, 2006 with chest pain of uncertain etiology. He was discharged with instructions to rest and avoid strenuous activity, continue current medication and to "please start taking your synthoroid" (Docket No. 10, pp. 285, 291 of 488).

        **5.**        **SOUTHWEST HEALTH CENTER, CLEVELAND OHIO.**

On June 16, 2008, a blood test was administered to evaluate the thyroid function and/or symptoms of hypothyroidism. There was a definite indication of a thyroid disorder (Docket No. 10, pp. 288-289 of 488).

        **6.**        **HOUGH HEALTH CENTER/SOUTHEAST HEALTH CENTER, CLEVELAND OHIO**

During an office visit on August 3, 2010, Dr. Usha Mehta, M. D., noted that Plaintiff was taking Synthroid® irregularly and he needed an Albuterol inhaler which he was using at least once every other day. A patient plan was provided which included refilling the appropriate medications and ordering lab studies (Docket No. 10, pp. 478-479, 488 of 488).

At the follow up visit on August 10, 2010, Dr. Mehta reduced the dosage of Synthroid® as it appeared to cause profuse sweating (Docket No. 10, p. 480-481 of 488).

On June 14, 2011, Dr. Mehta examined the normal function of the thyroid gland. She diagnosed Plaintiff with benign essential hypertension, acquired hypothyroid NEC and morbid obesity. She observed that primarily, Plaintiff had no apparent distress but his extremities were swollen

(Docket No. 10, pp. 482-484 of 488).

On July 25, 2011, Dr. Mehta noted that Plaintiff was noncompliant with the hypothyroidism medication and he had suffered a nose bleed that was attributable to failure to take the high blood pressure medications.  Another patient plan was implemented (Docket No. 10, pp. 485-486 of 488).

### IV. STANDARD OF DISABILITY DETERMINATION.

The standards for disability under CIB, DIB and SSI follow.

### 1.    CIB

Under the authority of the Act, the Social Security Administration (Administration) has promulgated regulations that provide for the payment of disabled children's insurance benefits. Generally, a claimant is entitled to child's benefits on the earnings record of an insured person who is entitled to old-age or disability benefits or who has died if--

- You are the insured person's child, based upon a relationship described in Sections 404.355 through 404.359;
- You are dependent on the insured, as defined in Sections 404.360 through 404.365;
- You apply;
- You are unmarried; and
- You are under age 18; you are 18 years old or older and have a disability that began before you became 22 years old; or you are 18 years or older and qualify for benefits as a full-time student as described in Section 404.367.

(b) Entitlement preclusion for certain disabled children. If you are a disabled child as referred to in paragraph (a)(5) of this section, and your disability was based on a finding that drug addiction or alcoholism was a contributing factor material to the determination of disability (as described in Section 404.1535) and your benefits ended after your receipt of 36 months of benefits, you will not be entitled to benefits based on disability for any month following such 36 months regardless of the number of entitlement periods you have had if, in such following months, drug addiction or alcoholism is a contributing factor material to the later determination of disability (as described in Section 404.1535).  20 C. F. R. § 404.350 (Thomson Reuters 2012).

## 2.  DIB & SSI

The Commissioner's regulations governing the evaluation of disability for DIB and SSI are identical for purposes of this case, and are found at 20 C. F. R. § 404.1520, and 20 C. F. R. § 416.920 respectively.  DIB and SSI are available only for those who have a "disability."  *Colvin v. Barnhart,* 475 F.3d 727, 730 (6th Cir. 2007) (*citing* 42 U. S. C. § 423(a), (d); *See also* 20 C.F.R. § 416.920). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  *Id.* (*citing* 42 U.S.C. § 423(d)(1)(A) (definition used in the DIB context); *See also* 20 C. F. R. § 416.905(a) (same definition used in the SSI context)).

To determine disability under Sections 404.1520 and 416.920, a plaintiff must first demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits.  *Id.* (*citing Abbott v. Sullivan,* 905 F.2d 918, 923 (6th Cir. 1990)).

Second, plaintiff must show that she suffers from a "severe impairment" in order to warrant a finding of disability.  *Id.*  A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities."  *Id.*

Third, if plaintiff is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, plaintiff is presumed to be disabled regardless of age, education or work experience.  *Id.*

Fourth, if the plaintiff's impairment does not prevent her from doing her past relevant work, plaintiff is not disabled.  *Id.*

For the fifth and final step, even if the plaintiff's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that plaintiff can perform, plaintiff

22

is not disabled. *Id.* (*citing Heston v. Commissioner of Social Security*, 245 F.3d 528, 534 (6ᵗʰ Cir. 2001)(internal citations omitted) (second alteration in original)). If the Commissioner makes a dispositive finding at any point in the five-step process, the review terminates. *Id.* (*citing* 20 C. F. R. § 404.1520(a)(4); 20 C. F. R. § 416.920(a)(4)).

## V. Jurisdiction, Scope and Standard of review.

A district court exercises jurisdiction over the final decision of the Commissioner pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3). This Court has jurisdiction over the final ruling of the district court pursuant to 28 U.S.C. § 1291, 42 U.S.C. § 405(g), and 42 U.S.C. § 1383(c)(3).

Congress has provided a limited scope of review for Social Security administrative decisions under 42 U.S.C. § 405(g). The findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive. *McClanahan v. Commissioner of Social* Security, 474 F.3d 830, 833 (6ᵗʰ Cir. 2006) (*citing* 42 U. S. C. § 405(g)). The court must affirm the Commissioner's conclusions unless the Commissioner failed to apply the correct legal standard or made findings of fact that are unsupported by substantial evidence. *Id.* (*citing Branham v. Gardner*, 383 F.2d 614, 626-627 (6ᵗʰ Cir. 1967)).

"Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (*citing Besaw v. Secretary of Health and Human Services*, 966 F.2d 1028, 1030 (6ᵗʰ Cir. 1992)). "The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion . . . *Id.* This is so because there is a 'zone of choice' within which the Commissioner can act, without the fear of court interference." *Id.* (*citing Buxton v. Halter*, 246 F.3d 762, 772 (6ᵗʰ Cir. 2001) (citations omitted)).

## VI. Analysis.

Plaintiff presents two issues for judicial review.  First, the ALJ erred by failing to incorporate his finding that Plaintiff had moderate difficulties in concentration, persistence or pace into his residual functional capacity analysis or a hypothetical question posed to the VE.  In response, Defendant argues that the ALJ reasonably evaluated Plaintiff's ability to work on a sustained basis.

Second, the ALJ's analysis of Plaintiff's credibility was not supported by substantial evidence.  In response, Defendant contends that the ALJ properly and reasonably weighed Plaintiff's credibility.

1. **CONCENTRATION, PERSISTENCE OR PACE**

a. **RESIDUAL FUNCTIONAL CAPACITY.**

In the first decision, the ALJ acknowledged that an individual's residual functional capacity is the ability to do physical and mental work activities on a sustained basis despite limitations from his impairments.  The ALJ failed, however, to explain whether he considered such abilities on a sustained basis in assessing Plaintiff's residual functional capacity.  On remand, the ALJ was ordered to consider whether, given his limitations, Plaintiff could work on a sustained basis.  The ALJ found that he had moderate difficulties in maintaining concentration, persistence or pace yet he did not incorporate that or an equivalent limitation into the residual functional capacity or hypothetical questions posed to the VE.  Consequently, in the earlier decision,  neither Plaintiff's residual functional capacity nor the jobs given at step five of the sequential evaluation accurately support a finding that  he can perform any sustained work activities.

According to Social Security regulations, concentration, persistence, or pace refers to the ability to sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks commonly found in work settings. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00 (Thomson Reuters 2012).  Limitations in concentration, persistence, or pace are best

observed in work settings, but may also be reflected by limitations in other settings.  *Id.*  In addition, major limitations in this area can often be assessed through clinical examination or psychological testing.  *Id.*  Wherever possible, however, a mental status examination or psychological test data should be supplemented by other available evidence.  *Id.*

> We will assess your ability to complete tasks by evaluating all the evidence, with an emphasis on how independently, appropriately, and effectively you are able to complete tasks on a sustained basis . . .  You may be able to sustain attention and persist at simple tasks but may still have difficulty with complicated tasks . . . However, if you can complete many simple tasks, we may nevertheless find that you have a marked limitation in concentration, persistence, or pace if you cannot complete these tasks without extra supervision or assistance, or in accordance with quality and accuracy standards, or at a consistent pace without an unreasonable number and length of rest periods, or without undue interruptions or distractions.  *Id.*

Determination of these functional limitations is a complex and highly individualized process that requires the consideration of multiple issues and all relevant evidence.  20 C. F. R. §§ 404.1520a, 416.920a (Thomson Reuters 2012).  The category of concentration, persistence or pace refers to the "ability to sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks commonly found in work settings."  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00 (Thomson Reuters 2012).

In accordance with the requirements of 20 C. F. R. §§ 404.1520a(c)(4), 416.920a(c)(4), the ALJ found that Plaintiff's mental impairments caused moderate restrictions in maintaining concentration, persistence or pace.  However, he concluded that Plaintiff's daily activities and activities since the alleged onset date, diminished the probability that Plaintiff had deficiencies in his ability to concentrate, persist or maintain pace such that he was incapable of any production standard on a sustained and continuous basis.  In arriving at this conclusion, the ALJ referred to several factors which he took into consideration commonly found in Plaintiff's testimony about the "work" setting:

1. Plaintiff was able to perform his work as a car detailer albeit at a slower pace.
2. Plaintiff quit or he was discharged but it was not because of his work product.

25

3.  Plaintiff was able to work with independently after oral instruction or demonstration.

Then the ALJ considered the limitations in concentration, persistence or pace in "life" settings:

1.  Plaintiff spent at least ten to eleven hours a day watching television and playing video games (Docket No. 10, pp. 165 of 488).
2.  Diagnosed with hypertension and hyperlipidemia, Plaintiff was generally compliant with his medication regimen (Docket No. 10, pp. 361-362 of 488).
3.  He visited with his four-year-old son twice monthly and during those visits, Plaintiff dressed and fed his son (Docket No. 10, pp. 334, 335 of 488).
4.  Plaintiff made simple meals, washed dishes, made his bed, drove a car, shopped for junk food and cared for his mother (Docket No. 10, pp. 334, 335 of 488).
5.  Plaintiff visited with his friend and they played competitive video games (Docket No. 10, pp. 345-346 of 488).

Finally, the ALJ considered the most objective evidence of Plaintiff's inability to concentrate advanced by clinical examinations:

1.  Dr. House administered tests to determine Plaintiff's sensorium and cognitive functioning. The results showed only mild limitations in concentration and attention and pace.  Plaintiff exhibited persistence in completing the tasks presented during the test.  Plaintiff had difficulty with serial seven-subtraction tasks after the first sequence, he could recall two of three objects after five minutes.  Plaintiff had a general knowledge of current events (Docket No. 10, p. 195 of 488).
2.  Dr. Flynn opined that Plaintiff had the capacity to do simple, routine work with infrequent changes but Plaintiff had moderate limitations in maintaining concentration, persistence or pace (Docket No. 10, p. 273 of 488).

Plaintiff's ability to maintain sufficient attention and focus to complete tasks in a reasonable amount of time necessary to maintain employment was limited to simple one-to-two step, routine, repetitive work which precluded high production quotas, oral or demonstrative instructions, superficial interaction with the public and with co-workers and tasks requiring no more than rudimentary reading. These limitations adequately account for and fully convey Plaintiff's moderate difficulties in his ability to concentrate, persist or keep pace that were fully supported by clinical examinations.  The ALJ's considered these limitations on Plaintiff's ability to perform work-related activities when assessing residual functional capacity (Docket No. 10, pp. 393-398 of 488).  In addition, the ALJ

26

considered that Plaintiff's ability to made simple meals, wash dishes, make his bed, shop and care for his mother all of which involved several steps and a fair amount of concentration and persistence. Driving required constant focus, concentration and maintenance of attention (Docket No. 10, pp. 334, 335 of 488).  Remand is not necessary to determine whether the ALJ took into account Plaintiff's moderate limitations in concentration, persistence and pace on this issue.

      **b.  HYPOTHETICAL QUESTION**.

      Plaintiff fails to explain why this particular case requires a more detailed hypothetical question to adequately account for his own moderate limitations in concentration, persistence or pace. Nevertheless, Plaintiff argues that the ALJ failed to incorporate these moderate limitations in the hypothetical question to the VE; therefore, the ALJ failed to sustain the burden at step five of the sequential evaluation.  The hypothetical limitations that the claimant was limited to simple, repetitive work without high production quotas, fail to account for the specific reference to moderate limitations in concentration, persistence or pace.

      Plaintiff relies in large part on the decision by United States Magistrate Judge Kenneth S. McHargh in *McNeman v. Astrue*, 2011 WL 5554051 (N.D.Ohio,2012).  In that case, the ALJ did not include a finding that Plaintiff had a moderate limitation in concentration, persistence or pace in the hypothetical question posed to the VE.  *Id.*  In fact, the hypothetical question that could even arguably have accounted for these deficiencies was the ALJ's question in which he asked the VE to consider a hypothetical individual that, *inter alia,* would be off-task roughly 25 percent of the time, to which the VE responded that such an individual would not be able to sustain full-time competitive employment.  *Id.*  Magistrate Judge McHargh was not persuaded that the ALJ's decision to limit Plaintiff to this type of work adequately conveyed McNeman's moderate limitation in concentration, persistence and pace.  *Id.*  As a consequence, the Magistrate Judge found that ALJ Carissimi's failure

to reference Plaintiff's moderate limitation in this area of functioning rendered the VE's testimony unreliable and it did not serve as substantial evidence to support the ALJ's step five finding.  *Id.*

In order for a VE's testimony in response to a hypothetical question to serve as substantial evidence in support of the conclusion that a claimant can perform other work, the question must accurately portray a claimant's physical and mental impairments.  *Mousseau v. Commissioner of Social Security*, 2012 WL 271379, *5 (E.D.Mich.,2012) (*citing Ealy v. Commissioner of Social Security*, 594 F.3d 504, 516 (6[th]Cir.2010)).  There is relevant authority ordering remand where an ALJ's hypothetical does not include a specific reference to moderate limitations in concentration or pace and only limits the hypothetical individual to unskilled work or simple, routine tasks.  *Id.* (*citing Benton v. Commissioner of Social Security*, 511 F. Supp. 2d 842, 849 (E.D.Mich.2007) (citation omitted)).  However, there is also authority that  an ALJ formed an accurate hypothetical by limiting the claimant to unskilled work and omitting a moderate concentration or pace limitation.  *Id.* (*See, e.g., Hess v. Commissioner of Social Security*, No. 07-13138, 2008 WL 2478325, at *7-8 (D D. Mich. June 16, 2008) (citation omitted)).

Here, the ALJ took into account the equivalent of moderate limitations in concentration, persistence and pace but never made the traditional reference to moderate limitations in concentration or pace in the hypothetical.  Using alternate examples that accurately and adequately accounted for the equivalent of moderate concentration, persistence and pace deficiencies, the ALJ noted that Plaintiff maintained some variable ability to remain focused for extended periods of time.  Accordingly, he excluded quotas or other aspects related to a moderate concentration limitation that seems to require a degree of sustained concentration, persistence or pace.  The ALJ included in the hypothetical examples of limitations to simple, two-step tasks, routine and repetitive work without high production quotas, no requirements of any production expectancy and no requirements that the

28

tasks performed required more than rudimentary reading; all instructions given orally or by demonstration; superficial interaction with the public and interaction with co-workers must be without negotiation or confrontation.  These limitations may be read cumulatively to encompass moderate concentrational, persistence or pace deficiencies and they therefore, adequately capture any restrictions to Plaintiff's ability to sustain concentration, persistence or pace.

Assuming that these limitations were objectively insufficient to account for moderate deficiencies, Plaintiff offers nothing persuasive about the alleged difficulties with concentration, persistence and pace that would preclude the work of a laundry laborer, hand packager or bench assembler.  To the extent that the limitations in cognitive functioning would address the ability to maintain concentration, persistence or pace, each job requires the performance of repetitive or short cycle work.  Once a small job is completed, the claimant will move on to another task within the same occupational group.  There are no production quotas or pacing deficiencies associated with these jobs.

Moreover, the ALJ's choice of hypothetical limitations is easily supported by evidence in the record that accurately portrays Plaintiff's mental impairment.  Dr. Flynn concluded that Plaintiff had moderate deficiencies in concentration, persistence or pace.  Despite these deficiencies, Dr. Flynn concluded that Plaintiff had the capacity to do simple, routine work with infrequent changes.  Dr. House concluded that Plaintiff's ability to concentrate and maintain attention was only mildly limited, his pace was a "bit slow" and he was persistent in trying to complete the examiner's tasks.  The ALJ's decision to incorporate these moderate restrictions into the hypothetical questions is wholly consistent with the objective medical evidence.

The Magistrate does not recommend that this case be remanded to the ALJ for the sole purpose of proposing a hypothetical question to the VE that incorporates moderate limitations in concentration, persistence or pace.  The ALJ's decision to incorporate the equivalent of moderate limitations is

29

appropriate and it is supported by the medical evidence.  Plaintiff's first claim for relief should be denied.

    2.  CREDIBILITY.

Plaintiff maintains that the ALJ's determination concerning his ability to perform work is faulty because it was based, in part, on the ALJ's improper assessment of his credibility. The ALJ made critical errors in considering whether his testimony was credible.  First, he failed to consider that Plaintiff's compliance with drug therapy was the result of a misunderstanding or faulty memory. Second, the ALJ erred in finding that because Plaintiff could perform minimal chores, he was capable of living independently.  Third, the ALJ erred in finding that he could manage his finances.  Fourth, the ALJ erred in concluding the extent of Plaintiff's ability to drive.

Under the analytical scheme created by the Administration, the ALJ must evaluate the credibility of the Social Security claimant when the disability determination cannot be made solely on the basis of objective medical evidence, considering the considering the plaintiff's statements about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined in Social Security Ruling 96–7p [TITLES II AND XVI: EVALUATION OF SYMPTOMS OF DISABILITY CLAIMS, 1996 WL 374186 (July 2, 1996)]. *Arnold v. Astrue,* 2012 WL 4866359, *7 (N.D.Ohio,2012) (See SSR 96–7p, 61 Fed.Reg. 34483, 34484–34485 (1990)).  These factors include: (1) the claimant's daily activities; (2) the location, duration, frequency and intensity of the pain; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness and side effects of any pain medication; (5) any treatment, other than medication, that the claimant receives or has received to relieve the pain; and (6) the opinions and statements of the claimant's doctors.  *Id.* (*citing Felisky v. Bowen*, 35 F.3d 1027, 1039–1040 (6th Cir. 1994)).  While she must consider the factors in Social Security Ruling 96–7p, an ALJ need not analyze all of the factors in her decision.  *Id.* (*see Boutros v. Astrue*, No. 1:09CV2574,

2010 WL 3420296, at *4 (Aug. 9, 2010)).  She must, however, show that she considered the relevant evidence and she must provide clear reasons for her credibility findings.  *Id*. (*citing* SSR 96–7p, Purpose section and citing and *quoting Felisky*, 35 F.2d at 1036 ("If an ALJ rejects a claimant's testimony as incredible, he must clearly state his reasons for doing so.")).

In this case, the ALJ found that Plaintiff was not credible in light of the observations made by his own mother, the psychologists that evaluated him, and the various inconsistencies in his own statements.  In evaluating Plaintiff's credibility, the ALJ did consider the factors of SSR 96-7p and the relevant regulations.  Upon review of the record, the Magistrate notes that the ALJ relied on the following facts:  (1) Plaintiff had a routine day during which he did very little by way of activities and with the onset of his mother's illness, Plaintiff was able to help around the house and prepare meals (Docket No. 10, p. 304 of 488); (2) the intensity and frequency of Plaintiff's chest pain and asthma were not confirmed by medical evidence (Docket No. 10, pp. 304-306 of 488); (3) there were few precipitating and aggravating factors of the chest pain and asthma; and (4) there were few, if any, documented side effects from the medications and treatments Plaintiff received (Docket No. 10, pp. 305-306 of 488).  He also considered the inconsistencies between the ME's testimony, the testimony of mental health consultants and the testimony given by Plaintiff and his mother and their questionnaires (Docket No. 10, pp. 305-309 of 488).

Upon review, the Magistrate is in accord with the ALJ's determinations of credibility and attributes great weight and deference to the decision, particularly since the ALJ had the opportunity of observing Plaintiff's demeanor while testifying.  Limited to evaluating whether or not the ALJ's explanations for partially discrediting Plaintiff were reasonable and supported by substantial evidence in the record, the Magistrate notes that the ALJ clearly acknowledged that Plaintiff claimed an inability to manage a checkbook and that he was able to drive (Docket No. 10, p. 304 of 488).  The

suggestion that Plaintiff can live independently is certainly present in the tenor of the decision but there is no indication of its expectancy or its adverse effect on the credibility determination.

Since the ALJ applied the proper standards in determining Plaintiff's credibility and provided a well-reasoned analysis supported by substantial evidence for discounting Plaintiff's credibility, the undersigned recommends that the Court affirm the Commissioner's credibility determination

### VII. CONCLUSION.

For these reasons, the Magistrate recommends that the Court affirm the Commissioner's decision denying Plaintiff's request for CIB, DIB and SSI and terminate the referral to the undersigned Magistrate Judge.

<u>/s/Vernelis K. Armstrong</u>
United States Magistrate Judge

Date:    January 3, 2013

### VI. NOTICE

Please take notice that as of this date the Magistrate's report and recommendation attached hereto has been filed. Pursuant to Rule 72.3(b) of the LOCAL RULES FOR NORTHERN DISTRICT OF OHIO, any party may object to the report and recommendations within fourteen (14) days after being served with a copy thereof. Failure to file a timely objection within the fourteen-day period shall constitute a waiver of subsequent review, absent a showing of good cause for such failure. The objecting party shall file the written objections with the Clerk of Court, and serve on the Magistrate Judge and all parties, which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. Any party may respond to another party's objections within fourteen days after being served with a copy thereof.

Please note that the Sixth Circuit Court of Appeals determined in *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981) that failure to file a timely objection to a Magistrate's report and recommendation foreclosed appeal to the court of appeals. In *Thomas v. Arn*, 106 S.Ct. 466 (1985), the Supreme Court upheld that authority of the court of appeals to condition the right of appeal on the filing of timely objections to a report and recommendation.